# United States Tax Court

T.C. Memo. 2024-29

ANTHONY AULISIO, JR.,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 13943-18.                           Filed March 13, 2024.

————————

Anthony Aulisio, Jr., pro se.

*Jillian S. LeMaster-Dwyer*, *Brian P. Beddingfield*, *Sarah C. Nadel*, and *Hans Famularo*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

MARSHALL, *Judge*: In a notice of deficiency dated April 9, 2018, respondent determined a deficiency of $14,878 and a section 6662(a)[1] accuracy-related penalty of $2,976 for petitioner's 2015 tax year. On July 16, 2018, petitioner timely filed his Petition for redetermination.[2] On October 25, 2019, respondent filed a Motion for Leave to File First Amendment to Answer alleging that petitioner had additional income of $101,413 based on the amount that petitioner reported on his Form 1040X, Amended U.S. Individual Income Tax Return, for the 2015 tax

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Except where otherwise indicated, monetary amounts are rounded to the nearest dollar.

[2] The Petition bears a U.S. postmark of July 9, 2018. *See* § 7502(a).

**[\*2]** year (2015 Amended Return). The Court granted respondent's motion and filed respondent's First Amendment to Answer.

After concessions, the issues remaining for decision are whether for the 2015 tax year petitioner (1) had $22,492 of unreported interest income and $11,055 in gross receipts as reported on his 2015 Amended Return Schedule C, Profit or Loss From Business, from his certified public accountant (CPA) business (Schedule C–1); (2) is entitled to deduct expenses of $44,950 associated with his CPA business; (3) is entitled to deduct $80,000 of Schedule C expenses associated with a leasing business (Schedule C–2); (4) is entitled to deduct a net operating loss (NOL) of $437,141; (5) is entitled to deduct $28,336 of home mortgage interest reported on Schedule A, Itemized Deductions; and (6) is entitled to deduct $14,114 of other itemized deductions consisting of property taxes on his primary and secondary residences and a charitable contribution.[3]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The Stipulation of Facts and the accompanying Exhibits are incorporated herein by reference. Petitioner resided in California when the Petition was filed.

I.    *2015 Return*

Petitioner is a CPA and attended law school. During the tax year at issue petitioner operated a CPA business and a purported equipment leasing business. On October 17, 2016, petitioner filed Form 1040, U.S. Individual Income Tax Return, for the 2015 tax year (2015 Return). He reported $10 of taxable income.

---

[3] Petitioner has conceded that he received $64,287 of unreported income as determined in the notice of deficiency. Petitioner has also conceded $112,125 of the $123,180 gross receipts related to his CPA business, and $1,250 in Schedule C–2 CAAJ Leasing Trust gross receipts that were reported on his 2015 Amended Return, but not $22,492 of interest income that was reported on the 2015 Amended Return. Respondent has conceded the section 6662(a) accuracy-related penalty. Respondent has also conceded that petitioner is entitled to deduct Schedule C–1 expenses of $12,755 and Schedule A mortgage interest of $14,164 for the 2015 tax year. Accordingly, the unreported income that remains in dispute is $11,055 in Schedule C–1 gross receipts, and $22,492 of interest income. All amounts stated in the recitation of the issues reflect reductions for the parties' concessions described in this footnote.

[*3] II.    *2015 Amended Return*

On September 11, 2017, respondent's Automated Underreporter (AUR) program mailed petitioner a Letter CP2000, proposing changes to his 2015 Return based on third-party reporting. Respondent's AUR program issued the notice of deficiency based on third-party reporting of unreported income of $64,287.

After receiving the Letter CP2000, petitioner signed the 2015 Amended Return under penalty of perjury and dated it October 23, 2017. On October 25, 2017, petitioner submitted the 2015 Amended Return to the local Internal Revenue Service (IRS) field office in Santa Ana, California. The IRS did not process the 2015 Amended Return.

On the 2015 Amended Return, Schedule C–1 was prepared with respect to petitioner's CPA business and Schedule C–2 related to petitioner's purported equipment leasing business. He reported income of $165,700: $22,492 in taxable interest, $18,778 in Social Security benefits, and $124,430 in Schedule C gross receipts. He also reported $55,296 of deductible expenses on Schedule C–1 and $72,500 on Schedule C–2. Petitioner also claimed an NOL carryover deduction of $437,141.

When petitioner's 2015 Amended Return was prepared, the IRS had already advised petitioner that it was proposing changes with respect to petitioner's 2015 tax year. In November 2018 an IRS tax compliance officer requested documentation to substantiate petitioner's 2015 Amended Return. Petitioner did not provide adequate substantiation.

III.   *Petitioner's Trusts*

A.    *HYEO/CAAJ Leasing Trust*

Petitioner is involved with different trusts that were referenced throughout the testimony and the record in this case. Petitioner formed the HYEO/CAAJ Leasing Trust (CAAJ Leasing Trust) to lease equipment and, as he testified, to "live off of the rent of the equipment and just kind of retire." For 2013, 2014, and 2015, petitioner reported activity from the CAAJ Leasing Trust on Schedules C of his tax returns.[4]

---

[4] On the Schedules C that petitioner included with his tax returns he used the name "HYEO Leasing" or "HYEO/CAAJ Leasing" to describe his leasing trust. For

[*4] On his 2013 tax return, petitioner attached Schedule C–2 for CAAJ Leasing Trust–Equipment Rental in North Carolina and a Schedule C for CAAJ Leasing Trust–Equipment Rental (Schedule C–3) in California. He also reported a $145,570 loss for a bankruptcy in North Carolina attributable to the CAAJ Leasing Trust. On his 2014 tax return petitioner attached Schedule C–2 for CAAJ Leasing Trust and again reported a loss of $145,600 for a bankruptcy in North Carolina. On his 2015 Amended Return petitioner attached Schedule C–2 for CAAJ Leasing Trust.

In addition to using the CAAJ Leasing Trust to purportedly hold and lease equipment, petitioner also used the CAAJ Leasing Trust with respect to his nonequipment property. Robin Donatelli was the trustee of the CAAJ Leasing Trust. Russell Singer was a real estate broker for Adobe Oil Development Corp. (Adobe), the lender on petitioner's property in Laguna Beach, California (Laguna Beach Property). Petitioner wanted the loan from Adobe with respect to the Laguna Beach Property to be in the name of the CAAJ Leasing Trust; as a result, Donatelli signed the loan as the obligor in her capacity as the trustee and authorized signatory of the CAAJ Leasing Trust. Singer did not request that Donatelli sign on the loan for the Laguna Beach Property. Singer considered petitioner to be the borrower on the loan because Singer looked to petitioner's profession as a CPA and the fact that he would reside at the property. Singer required petitioner to sign a separate personal guaranty on the loan. Additionally, petitioner placed other property under the CAAJ Leasing Trust.

B.    *Cooper Trust*

On his 2015 Amended Return, petitioner reported $22,492 in taxable interest from the Cooper Trust.[5] He did not provide any records relating to the Cooper Trust for the 2015 tax year. Donatelli also served as the trustee of the Cooper Trust. The Cooper Trust was the trust of a deceased childhood friend, Joan Cooper, and Cooper's children were the beneficiaries.

---

purposes of this Opinion we refer only to the CAAJ Leasing Trust, which performed the activities that he attributed to either HYEO Leasing or HYEO/CAAJ Leasing on his tax returns.

[5] On petitioner's 2016, 2017, and 2018 tax returns, he reported interest income from the Cooper Trust of $36,000, $42,500, and $42,500, respectively.

[*5]   The Cooper Trust did not file a tax return for the 2015, 2016, or 2017 tax year. The Cooper Trust was a grantor trust, and Cooper was the grantor of the trust.

IV.   *Unreported Income*

Petitioner has conceded most of the unreported income that was at issue in this case.[6] The only amounts that remain in dispute are respondent's determinations that petitioner received $22,492 of interest income from the Cooper Trust and an additional $11,055 in gross receipts from his Schedule C–1 CPA business as reflected on his 2015 Amended Return.

On Schedule B, Interest and Ordinary Dividends, of petitioner's 2015 Amended Return, he reported $22,492 in taxable interest income from Cooper Trust.

On his 2015 Amended Return petitioner reported $123,180 in gross receipts on Schedule C–1 for his CPA business and $1,250 in gross receipts on Schedule C–2 for his purported leasing business. In his Pretrial Memorandum and at trial petitioner argued that his gross receipts for his Schedule C–1 CPA business were $112,125 and not $123,180 as reported on the 2015 Amended Return. Thus, petitioner has conceded $112,125 of gross receipts for his Schedule C–1 CPA business. Accordingly, $11,055 in Schedule C–1 gross receipts remains in dispute.

V.   *Schedule C–1 Business Expenses*

On the 2015 Amended Return petitioner reported Schedule C–1 business expenses of $55,296 as follows:

---

[6] Respondent's notice of deficiency determined that petitioner failed to include income reported on seven Forms 1099–MISC, Miscellaneous Income, totaling $48,326, and $18,778 of Social Security benefits. At trial petitioner conceded that he failed to report this income of $64,287 for tax year 2015 as determined in the notice of deficiency. In respondent's First Amendment to Answer he asserted an increased deficiency of $123,180 based on the amounts that petitioner reported in his 2015 Amended Return Schedule C–1 gross receipts related to petitioner's CPA business, and $1,250 in Schedule C–2 CAAJ Leasing Trust gross receipts. At trial petitioner conceded the $1,250 in Schedule C–2 CAAJ Leasing Trust gross receipts and $112,125 of the $123,180 gross receipts for his Schedule C–1 CPA business. Accordingly, the only unreported income that remains in dispute is $11,055 in Schedule C–1 gross receipts and $22,492 of interest income from the Cooper Trust.

[*6]

| Expense | Amount |
|---|---|
| Car and Truck Expenses | $19,329 |
| Interest Expense – Other | 2,155 |
| Office Expenses | 8,322 |
| Rent or Lease Other Business Property | 10,400 |
| Supplies | 846 |
| Travel – Meals | 182 |
| Other Expenses | 14,062 |
| **Total** | **$55,296** |

However, on October 28, 2019, petitioner submitted documents to respondent to substantiate expenses associated with his Schedule C–1 business activity and asserted that he had $18,574 in Schedule C–1 business expenses.

In his Pretrial Memorandum and at trial, petitioner asserted modified amounts with respect to the identified expenses and conceded he was entitled to deduct only $44,950 in Schedule C–1 business expenses including an adjustment to income for self-employed health insurance expense. The following table represents the modified Schedule C–1 expenses that petitioner asserted along with respondent's subsequent concessions:

| Expense | Amount Asserted | Amount Allowed |
|---|---|---|
| Car and Truck | $2,990 | $751 |
| Irvine Property Expenses | 20,505 | -0- |
| Tax Program | 8,712 | 8,712 |
| Telephone | 720 | 720 |
| Internet | 480 | 480 |
| Bank Charges | 228 | 228 |
| Virtual Office | 1,140 | -0- |
| Fax | 120 | 120 |
| Supplies | 1,136 | 1,136 |
| Maintenance | 123 | 123 |

| | | |
|---|---:|---:|
| **[*7]** Post Office | 60 | 60 |
| Computer Expense | 268 | 269 |
| Software[7] | -0- | 158 |
| Outside Services | 3,575 | -0- |
| Continuing Education | 599 | -0- |
| Health Insurance | 4,294 | 1,259 |
| **Total** | **$44,950** | **$14,016** |

A. *Car and Truck Expenses*

On his 2015 Amended Return petitioner reported $19,329 in car and truck expenses. This amount was based on petitioner's assertion that he drove 33,615 miles for the 2015 tax year for his Schedule C–1 CPA business and the standard mileage rate of $0.575. In his October 28, 2019, submission to respondent to substantiate expenses, petitioner changed the mileage that he asserted driving for his Schedule C–1 CPA business to 1,306 miles. Respondent allowed the 1,306 miles at the standard mileage rate of $0.575 for the 2015 tax year, resulting in a deduction of $751.

At trial petitioner changed the mileage amount from his October 28, 2019 submission to respondent, and asserted that he drove 5,200 miles for his Schedule C–1 business. During the 2015 tax year petitioner kept a calendar where he wrote down the names and addresses of people he visited. All of the names and addresses were of clients of his Schedule C–1 CPA business. Subsequently, he reviewed the calendar and determined the mileage.

B. *Expenses Related to the Irvine Property*

In his Pretrial Memorandum petitioner asserted $20,505 in Schedule C–1 business expenses associated with his property in Irvine, California (Irvine Property), comprising $11,754 in mortgage interest, $4,620 in homeowners' association costs, $3,651 in property taxes, and $480 in utilities. These expenses were not reported on petitioner's 2015 Amended Return. Neither were they reported on his October 28, 2019

---

[7] At trial petitioner did not assert a software expense of $158; however, respondent conceded this expense as part of the $14,016 in respondent's Summary of Expenses Allowed.

[*8] submission to respondent to substantiate his Schedule C–1 business activity expenses.

Petitioner borrowed funds from Linda Mercure memorialized in two notes (i.e., for $75,000 and $150,000) for a total of $225,000. The notes were secured by the Irvine Property and petitioner's secondary home in Running Springs, California (Running Springs Property). Petitioner used $75,000 of the loan proceeds to pay down the loan on his primary residence, the Laguna Beach Property. He did so by directing Mercure to directly transfer the $75,000 loan proceeds to Singer at Adobe. Petitioner did not provide canceled checks or bank statements showing that he made payments on the loans in 2015; however, Mercure received monthly interest payments of $11,754 on the loans and reported this interest as income on her 2015 return.

Petitioner asserts he is entitled to a deduction for $4,620 in homeowners' association costs for the Irvine Property. The monthly cost was $385. Petitioner was unsure whether he paid any homeowners' association costs in 2015.

Petitioner seeks to deduct $3,651 in property taxes and $480 in utility expenses for the Irvine Property. Petitioner was unsure whether he paid any property taxes for the Irvine Property in 2015. As to the utility expenses, petitioner introduced into evidence an account printout for online billing and payments from the electricity provider, Southern California Edison, from May 2020 to March 2022. The account printout does not state the property address for which the electricity service was provided other than a handwritten address added by petitioner.

C.      *Virtual Office Expense*

At trial petitioner asserted $1,140 in virtual office expenses related to his Schedule C–1 business activity. Petitioner provided a credit card authorization form for "Premier Business Centers" dated November 3, 2016, for $95 as well as an invoice from "Premier Business Centers" dated December 1, 2013, for $95. Petitioner could not find documentation regarding the virtual office for the 2015 tax year.

D.      *Continuing CPA Education*

In addition to the expenses associated with the Irvine Property, petitioner sought to deduct $600 related to continuing education for his CPA license for the 2015 tax year.

**[\*9]** E.  *Health Insurance*

Finally, petitioner asserted a health insurance adjustment to income of $4,294 for his Schedule C–1 CPA business. Respondent has conceded that petitioner is entitled to an adjustment to income for a self-employed insurance deduction for $1,259 for Medicare Part B premiums, which was directly deducted from his Social Security benefits for the 2015 tax year. Additionally, petitioner seeks an adjustment to income for a self-employed insurance deduction for $3,035 for health insurance premiums he asserts he paid to Blue Cross.

VI.  *CAAJ Leasing Trust*

Next, petitioner claimed deductions for expenses related to the CAAJ Leasing Trust business. On petitioner's 2015 Amended Return, he attached a Schedule C–2 for "HYEO/CAAJ Leasing" and reported $1,250 in gross receipts and $72,500 in expenses. Petitioner's reported Schedule C–2 gross receipts and expenses for tax years 2013 through 2016 are as follows:

| Tax Year | Gross Receipts | Expenses | Net Loss |
|---|---|---|---|
| 2013 Schedule C–2 | -0- | $145,570 | −$145,570 |
| 2013 Schedule C–3[8] | -0- | 1,900 | −1,900 |
| 2014 | $1,250 | 145,600 | −144,350 |
| 2015 | 1,250 | 72,500 | −71,250 |
| 2016 | 1,285 | 75,800 | −74,515 |
| **Total:** | **$3,785** | **$441,370** | **−$437,585** |

On Schedule C–2 for his 2015 Amended Return, petitioner reported "Other Expenses" for a "Court Judgment Related to Equipment" for $72,500. This expense related to a lawsuit involving a 2009 towing of petitioner's 1987 Jeep from the Irvine Property. In June 2009 petitioner's homeowners' association towed his 1987 Jeep from outside the Irvine Property. Petitioner sued several parties involved including the towing company and the homeowners' association. After

---

[8] On petitioner's 2013 tax return he separated CAAJ Leasing Trust's activities onto two Schedules C. He included a Schedule C–2 for CAAJ Leasing Trust's equipment rental activities in North Carolina and a Schedule C–3 for CAAJ Leasing Trust's equipment rental activities in California. *See* Ex. 1000-R. In subsequent years petitioner reported CAAJ Leasing Trust's activities on a single Schedule C.

[*10] several lawsuits, on April 6, 2015, petitioner lost a judgment for malicious prosecution and was ordered to pay $73,767. However, petitioner did not pay the judgment and actively contested the lawsuit through June 2017.

On June 9, 2017, the Court of Appeal of California for the Fourth District (Court of Appeal of California) reversed the judgment against petitioner in *Bancroft v. Aulisio*, No. G051732, 2017 WL 2493139 (Cal. Ct. App. June 9, 2017). Thus, the judgment had already been overturned by the time petitioner signed the 2015 Amended Return on October 23, 2017. Even though the judgment had been overturned, petitioner reported the expense for the court judgment on his Schedule C–2. We note that petitioner sought to change his method of accounting for the Schedule C–2 business on his 2015 Amended Return to the accrual method.

## VII.  *NOL*

On petitioner's 2015 Amended Return he claimed an NOL deduction of $437,141. Petitioner asserts the NOL originated from the loss of certain equipment that was leased by his Schedule C–2 business to companies in North and South Carolina. The record contains contradictory evidence on the origin and nature of the loss.

## VIII.  *Itemized Deductions*

Petitioner asserts he is entitled to an itemized deduction of $42,500 for mortgage interest with respect to the Laguna Beach Property. Petitioner did not claim a mortgage interest deduction on his 2015 Amended Return. As discussed above, petitioner took out a loan from Singer, and his company Adobe, in the name of the CAAJ Leasing Trust. Singer required petitioner to sign a personal guaranty for the loan.

Petitioner provided respondent with a 2015 Form 1098, Mortgage Interest Statement, from "Adobe Oil & Development Corp." The Form 1098 was issued to Donatelli as the trustee of the CAAJ Leasing Trust; however, the payer's Social Security number did not match the Social Security number that belongs to Donatelli. At petitioner's request Singer changed the tax identification number on the Forms 1098 that were issued annually for the loan. Singer could not recall what year that change occurred. Adobe issued the 2015 Form 1098 to Donatelli with the information petitioner provided.

**[\*11]** Petitioner provided respondent with substantiation for four $3,541 payments that he made in 2015 to Adobe totaling $14,164. Petitioner is unable to substantiate the remaining eight payments. As discussed above, respondent has conceded that petitioner is entitled to a mortgage interest deduction for the $14,164 that petitioner substantiated.

In addition to mortgage interest, in this litigation petitioner asserted a deduction for property taxes totaling $10,476 related to the Running Springs Property in San Bernardino County, California. Petitioner also asserted a deduction for property taxes totaling $2,868 related to the Laguna Beach Property in Orange County, California.

On December 10, 2015, property taxes of $1,084 were paid by credit card to San Bernardino County. The payment receipt does not state the address of the parcel subject to the property taxes; however, the payment receipt contains the following description line item identifier: "TAX PMT APN 0328233120000." The real property tax bill for the Running Springs Property lists the CAAJ Leasing Trust as the owner of record of the Running Springs Property and contains the same numerical identifier as was listed on the payment receipt, 0328233120000. The payment receipt for the property tax bill states that the payor's billing address was the Laguna Beach Property and lists an email address belonging to petitioner.

Finally, petitioner asserts a $500 itemized deduction for a charitable contribution to the Los Angeles Philharmonic. The "Friends of the LA Phil" sent petitioner an undated letter that states "Thank you for your gift! Your membership has been upgraded. You are now at the Rhapsody ($500) membership level." The letter then invites petitioner to attend events.

On April 9, 2018, respondent issued the notice of deficiency.

OPINION[9]

I.   *Burden of Proof*

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct and the taxpayer bears the burden of

---

[9] Absent a stipulation to the contrary, this case is appealable to the U.S. Court of Appeals for the Ninth Circuit, and we follow the precedent of that court that is

[*12] proving that those determinations are in error. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Conversely, the Commissioner bears the burden of proving new matters asserted in his answer. *See* Rule 142(a).

Section 7491(a)(1) provides that if, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Commissioner shall have the burden of proof with respect to that issue. *See Higbee v. Commissioner*, 116 T.C. 438, 440–41 (2001). For the burden to be placed on the Commissioner under this section, however, the taxpayer must demonstrate that he has: (1) complied with the requirements under the Code to substantiate any item, (2) maintained all records required under the Code, and (3) cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews. *See* § 7491(a)(2); *Higbee*, 116 T.C. at 440–41.

As discussed above, petitioner has conceded that he received $64,287 of unreported income as determined in the notice of deficiency. Petitioner has also conceded additional unreported income that was reported on his 2015 Amended Return except for (i) $22,492 of interest income and (ii) an additional $11,055 in gross receipts from his Schedule C–1 CPA business. Thus, petitioner has conceded all of the unreported income at issue except for the $22,492 of interest income and an additional $11,055 in gross receipts from his Schedule C–1 CPA business that was reported on the 2015 Amended Return. The 2015 Amended Return was admitted into evidence as part of the parties' Stipulation of Facts. Petitioner signed the 2015 Amended Return under penalty of perjury. In his First Amendment to Answer, respondent asserted an increased deficiency based on the 2015 Amended Return which included the $22,492 of interest income and the $11,055 in gross receipts from petitioner's Schedule C–1 CPA business.[10]

---

squarely on point. *See* § 7482(b)(1); *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).

[10] Respondent's Motion for Leave to File a First Amendment to Answer and his First Amendment to Answer referred to the $22,492 as "wages." However, the 2015 Amended Return that the First Amendment to Answer was based on reflects that the $22,492 of income was interest income. The parties' other submissions to this Court also clearly reflect that the $22,492 of income that respondent referenced in the First Amendment to Answer was with respect to interest, and not wages.

**[*13]** We are entitled to rely on petitioner's 2015 Amended Return because a taxpayer's statements on his or her tax return are admissions that may be overcome only through cogent evidence. *See Waring v. Commissioner*, 412 F.2d 800, 801 (3d Cir. 1969), *aff'g per curiam* T.C. Memo. 1968-126; *Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 322 (2013). This is true even if the Commissioner does not accept the taxpayer's return for filing. *See, e.g., Brown v. Commissioner*, T.C. Memo. 2014-167, at *19. Thus, because respondent's increased deficiency asserted in the Amendment to Answer was based on petitioner's 2015 Amended Return that was included in the Stipulation of Facts, respondent has satisfied his burden of proof on these new matters. Petitioner must present cogent evidence to overcome the admissions on his tax return regarding the $22,492 of interest income and the $11,055 in additional gross receipts from petitioner's Schedule C–1 CPA business. *See Waring v. Commissioner*, 412 F.2d at 801; *Chapman Glen Ltd.*, 140 T.C. at 322.

Additionally, petitioner has introduced his entitlement to an NOL deduction and a variety of other deductions (for reported Schedule C, mortgage interest, property tax, and charitable contribution expenses) into this case through the 2015 Amended Return, his pleadings before this Court, or at trial. In his Motion for Leave to File a First Amendment to Answer and his First Amendment to Answer, respondent did not raise the NOL or the other deductions that petitioner asserted as issues. Rather, respondent sought to amend his Answer to assert that petitioner received additional unreported income. The issues involving the NOL and the other deductions were properly tried by the parties' consent. *See* Rule 41(b). Because petitioner raised the NOL and the other deductions as new matters, the burden of proof remains with petitioner to show his entitlement to any deductions for his reported expenses.

In his posttrial Opening Brief petitioner argued that the burden of proof should shift to respondent under section 7491(a) with respect to substantiating the existence of the NOL. However, petitioner has failed to present credible evidence with respect to the NOL and has instead provided contradictory testimony and exhibits as to the origin and nature of the alleged loss. Accordingly, the burden of proof remains on petitioner with respect to the NOL carryforward.

II. *Gross Income*

In his First Amendment to Answer, respondent alleged that petitioner received $22,492 in interest income for the 2015 tax year and

**[*14]** increased the deficiency accordingly. The First Amendment to Answer was based on the 2015 Amended Return that petitioner signed under penalty of perjury. Petitioner submitted the 2015 Amended Return to the IRS, but the IRS did not process it. As discussed above, petitioner must present cogent evidence to overcome the admissions on the 2015 Amended Return. Thus, petitioner must present cogent evidence that (i) the $22,492 represents loan proceeds and not interest income, and (ii) respondent's determination that petitioner received an additional $11,055 in gross receipts from petitioner's Schedule C–1 CPA business is arbitrary and excessive. *See Helvering v. Taylor*, 293 U.S. 507, 515 (1935).

Generally, gross income means all income from whatever source derived. *See* § 61(a); *Charley v. Commissioner*, 91 F.3d 72, 73 (9th Cir. 1996), *aff'g in part, rev'g in part* T.C. Memo. 1993-558. Gross income includes any funds that the taxpayer receives lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition. *See James v. United States*, 366 U.S. 213, 219 (1961). However, it does not include loan proceeds. *Id.*; *see also Commissioner v. Tufts*, 461 U.S. 300, 307 (1983).

Petitioner's 2015 Return, upon which the notice of deficiency was based, reported $10 of interest income.[11] On his 2015 Amended Return petitioner reported $22,492 of interest income received from the Cooper Trust. Petitioner contends that the $22,492 reported on his 2015 Amended Return was not interest income but rather loan proceeds from

---

[11] Petitioner testified that he accidentally submitted substantive information from an extension request that he filed with the IRS in April 2016 on the 2015 Return. He testified that he "hit the wrong button and sent in the extended return as a regular return rather than the real return that had been prepared." Tr. 108:7–10. Nonetheless, the 2015 Return included substantive information such as exemptions, filing status, and the standard deduction. Petitioner testified that he accidentally used the data from his extension request on the 2015 Return and "right at the last minute, I hit the wrong button." Tr. 110:8–16. The alleged extension request is not in the record. Petitioner's testimony is unclear on what document was actually the extension request for the 2015 tax year. It appears that he may have filed an extension request by completing a Form 1040, rather than requesting an extension by filing a Form 4868, Application for Automatic Extension of Time to File U.S. Individual Income Tax Return. There is no Form 4868 in the record. Petitioner's explanation is unconvincing. In any event, petitioner filed the 2015 Return upon which the notice of deficiency was properly based. *See Chapman Glen Ltd.*, 140 T.C. at 322 (explaining that a taxpayer's statements on their tax returns are admissions that may be overcome only through cogent evidence).

**[\*15]** the Cooper Trust and that the $22,492 should not be included in his gross income.

To explain why he reported the $22,492 as interest income on his 2015 Amended Return, petitioner theorized that his friend and assistant, Lynn Aldis, who he testified prepared his 2015 Amended Return, saw deposits from the alleged loan in petitioner's bank account and guessed that the deposits were income.[12] To determine whether the $22,492 that petitioner reported on his 2015 Amended Return is income, the Court must analyze whether that amount represents the proceeds of a loan on which the petitioner is a debtor, or interest income petitioner received from the Cooper Trust.

The proceeds of a bona fide loan are not includible in gross income because the receipt of money is offset by a corresponding obligation to repay. *See Commissioner v. Tufts*, 461 U.S. at 307. For a bona fide loan to exist the parties to the transaction must have had an actual, good-faith intent to establish a debtor-creditor relationship at the time the funds were advanced. *Beaver v. Commissioner*, 55 T.C. 85, 91 (1970). An intent to establish a debtor-creditor relationship exists if the debtor intends to repay the loan and the creditor intends to enforce the repayment. *Id.*; *Fisher v. Commissioner*, 54 T.C. 905, 909–10 (1970).

Objective factors are considered to determine the parties' intent and whether a bona fide loan occurred, and no single factor is dispositive. *See Welch v. Commissioner*, 204 F.3d 1228, 1230 (9th Cir. 2000), *aff'g* T.C. Memo. 1998-121; *Frierdich v. Commissioner*, 925 F.2d 180, 182 (7th Cir. 1991), *aff'g* T.C. Memo. 1989-393. We examine the following factors to determine whether the $22,492 that petitioner received and reported on his 2015 Amended Return was, in fact, a loan:

> (1) whether the promise to repay is evidenced by a note or other instrument;
>
> (2) whether interest was charged;

---

[12] There was conflicting testimony on who prepared petitioner's returns. Petitioner initially testified that Aldis prepared his 2015 Amended Return. *See* Tr. 104:20–22. He stated that Aldis reviewed his records and guessed as to what items appeared to be income and what items appeared to be expenses. *See* Tr. 105:20–23; Tr. 120:19–22. However, petitioner also provided contradictory testimony that he prepared the 2015 Return and the 2015 Amended Return. *See* Tr. 103:17–22. In light of petitioner's conflicting testimony, we do not find credible his assertion that Aldis prepared his 2015 Amended Return.

**[\*16]** (3) whether a fixed schedule for repayments was established;

(4) whether collateral was given to secure payment;

(5) whether repayments were made;

(6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and

(7) whether the parties conducted themselves as if the transaction were a loan.

*See Welch v. Commissioner*, 204 F.3d at 1230.

We note that petitioner's testimony on the characterization of the $22,492 was inconsistent with what he reported on the 2015 Amended Return and his 2016 through 2018 returns which reported interest income received from the Cooper Trust. Petitioner testified that he never received income from the Cooper Trust; however, his 2015 Amended Return reported that he received $22,492 in interest income from the Cooper Trust. He also offered inconsistent testimony as to whether his alleged debt to the Cooper Trust was evidenced by a note. Initially, petitioner testified that Donatelli, as the trustee of the Cooper Trust, lent him small amounts over the years but that she eventually lent him a large amount of $20,000 to $25,000 and that Donatelli took a note for this large loan. Later, petitioner testified that there was no note when he borrowed the $20,000 to $25,000 amount.[13]

Turning to the factors listed above, the first factor, whether the promise to repay was evidenced by a note or other instrument, supports income treatment. As previously discussed, petitioner provided conflicting testimony on whether the alleged loan was evidenced by a debt instrument. First, petitioner testified that the Cooper Trust took a note from him; however, later he testified that there was never a note for the alleged loan from the Cooper Trust to him.[14] If there was a debt

---

[13] Tr. 120:13–14 ("At the time, I borrowed the $25,000. There wasn't even a note."); Tr. 120:18–19 ("So that's I want to say there was never a note.").

[14] *Compare* Tr. 107:6–7 ("But the 20 to $25,000 one wasn't. That was a big amount. And [Donatelli as the trustee for the Cooper Trust] took a note."), *with* Tr. 120:13–19 ("At the time, I borrowed the 25,000. There wasn't even a note. I was just paying five percent. And the note didn't come up until the loan was amortized. And I

**[\*17]** instrument evidencing the debt, it was not introduced into evidence in this case. *See id.* at 1230–31. The absence of such documentation and petitioner's vacillating testimony strongly suggests that there was no debt instrument between petitioner and the Cooper Trust. This factor supports income treatment.

The second factor, whether interest was charged, supports loan treatment. Donatelli testified that there was a five percent interest rate on the alleged loan. There is no evidence corroborating Donatelli's testimony. Nonetheless, we find that this factor narrowly supports loan treatment. *But see id.* at 1231.

The third factor, whether there was a fixed schedule for repayments, supports loan treatment. Donatelli testified that petitioner made interest only payments on the alleged loan; and later, when the terms of the loan were ostensibly changed, petitioner made monthly $500 payments with five percent interest for five years. However, aside from Donatelli's testimony there is no document or payment schedule in the record to corroborate the payment terms. Accordingly, this factor narrowly supports loan treatment. *But see id.*

The fourth factor, whether collateral was given to secure payment, supports income treatment. There was no evidence that the alleged loan was secured or that any collateral was given. Donatelli testified as to the terms of the original alleged loan and its subsequent amendment. She did not discuss the Cooper Trust's receiving any collateral from petitioner. Moreover, the record contains no documentation of a note or security interest for the alleged loan. A lender does not have a valid security interest in property without a written security agreement that provides a description of the collateral.[15] As discussed in the context of the first factor, at trial petitioner gave inconsistent testimony on whether the alleged loan was evidenced by a note. First he testified that there was a note, and then he testified that there no note for the alleged loan from the Cooper

---

started paying it off. If I had that much money, I wish I had that much money, but I didn't. So that's I want to say there was never a note.").

[15] *See Greyhound Real Est. Fin. Co. v. Off. Unsecured Creditors' Comm.* (*In re Northview Corp.*), 130 B.R. 543, 546 (B.A.P. 9th Cir. 1991) ("[California] Commercial Code § 9203(1)(b) provides that one of the prerequisites for the creation of a valid security interest is 'a security agreement which contains a description of the collateral.").

**[\*18]** Trust.[16] When questioned as to why he had not provided the underlying documentation to support his position, petitioner again repeated that "there were no notes." As with the first factor, the absence of a security agreement evidencing any collateral and petitioner's vacillating testimony as to the alleged loan documentation strongly suggests that the alleged loan was not secured by any collateral. *See id.* Accordingly, this factor supports income treatment.

The fifth factor, whether the borrower made repayments, supports loan treatment. As with the fourth factor above, we do not find petitioner's testimony credible on this issue. However, Donatelli testified that petitioner made payments on the alleged loan. We note that there is no evidence corroborating her testimony. Nonetheless, we find that this factor narrowly supports loan treatment. *But see id.*

The sixth factor, whether the borrower had a reasonable prospect of repaying the alleged loan and whether the lender had sufficient funds to advance the alleged loan, supports income treatment. The record does not contain any evidence regarding whether the alleged lender, the Cooper Trust, considered or analyzed petitioner's ability to repay the alleged loan. *See id.* This factor supports income treatment.

Finally, the seventh factor, whether the parties conducted themselves as if the transaction were a loan, supports income treatment. Petitioner's records, and in particular, his 2015 Amended Return that was signed under penalty of perjury, reported the $22,492 as interest income *received from* the Cooper Trust. We are entitled to rely on petitioner's 2015 Amended Return because a taxpayer's statements on his or her tax return are admissions that may be overcome only through cogent evidence. *See Waring v. Commissioner*, 412 F.2d at 801; *Chapman Glen Ltd.*, 140 T.C. at 322; *see also Greenberg v. Commissioner*, T.C. Memo. 2018-74, at \*39, *aff'd*, 10 F.4th 1136 (11th Cir. 2021), *and aff'd sub nom. Goddard v. Commissioner*, No. 20-73023, 2021 WL 5985581 (9th Cir. Dec. 17, 2021); *Brown*, T.C. Memo. 2014-167, at \*19.

Petitioner's admission on his 2015 Amended Return is buttressed by his consistent reporting of interest income from the Cooper Trust on his post-2015 returns. He reported interest income from the Cooper Trust of $36,000, $42,500, and $42,500 on his 2016, 2017, and 2018 tax returns, respectively. Petitioner has not introduced other cogent

---

[16] Tr. 120:13–20 ("There was no documentation. There were no checks.").

**[*19]** evidence that would overcome the admission on his 2015 Amended Return that the $22,492 was income.

Aside from his 2015 Amended Return and his 2016 through 2018 returns, petitioner provided inconsistent testimony on whether there was ever a note for the alleged loan. Initially, petitioner stated that Donatelli took a note. However, shortly thereafter petitioner unequivocally testified that "there was never a note . . . . There was no documentation. There were no checks." The only other evidence in the record regarding the parties' conduct is petitioner's and Donatelli's testimony that he made payments on the alleged loan. In light of the inconsistencies we do not find credible petitioner's testimony on this issue. Thus, we are left to weigh petitioner's consistent reporting position on four years of his tax returns (that he received interest from the Cooper Trust) against Donatelli's testimony that he made payments on an alleged loan. On balance, we believe that Donatelli's testimony is insufficient to overcome petitioner's admission on his tax returns that consistently reported amounts received from the Cooper Trust as interest income. *See Welch v. Commissioner*, 204 F.3d at 1231. Thus, this seventh factor supports income treatment.

Petitioner has not presented cogent evidence sufficient to overcome the admissions on his 2015 Amended Return. After considering all of the factors and the totality of the evidence, we conclude that there was no genuine debtor-creditor relationship where petitioner borrowed funds from the Cooper Trust. Therefore, we agree with respondent's determination that the $22,492 was not a loan from the Cooper Trust to petitioner and instead was interest income that petitioner received from the Cooper Trust. This interest should have been included in income on his 2015 Return.

Petitioner's 2015 Amended Return also reported $123,180 in Schedule C–1 gross receipts. At trial petitioner conceded that he received $112,125 in gross receipts from his Schedule C–1 CPA business but disputes the additional $11,055 in gross receipts that he reported on his 2015 Amended Return. Petitioner's statement on his 2015 Amended Return that his Schedule C–1 CPA business had $123,180 in gross receipts is an admission that may be overcome only through cogent evidence. *See Chapman Glen Ltd.*, 140 T.C. at 322; *Brown*, T.C. Memo. 2014-167, at *19. Respondent has satisfied his burden of proof for this issue by introducing into the record petitioner's 2015 Amended Return. To overcome his admission in the 2015 Amended Return, petitioner relies on a schedule prepared by Aldis that he found on his computer.

**[\*20]** Petitioner testified that he "just assumed" that the schedule was correct and that the 2015 Amended Return was incorrect.

Petitioner has not explained why the total gross receipts figure that Aldis purportedly included on the schedule that she purportedly prepared and that he found on his computer is more accurate than the gross receipts that he reported on the 2015 Amended Return. Petitioner's testimony on the origin of the schedule and the total gross receipts that is shown on the schedule for his CPA business is uncorroborated. Accordingly, petitioner has not introduced cogent evidence to overcome the admission on his 2015 Amended Return that his Schedule C–1 CPA business had $123,180 in gross receipts in 2015.

III.    *Schedule C–1 Business Expenses*

   A.    *Summary of the Parties' Arguments*

Petitioner maintains that he paid all business expenses reported on Schedule C–1 of his Amended 2015 Return and seeks to deduct expenses that were not reported on Schedule C–1 but that he raised during the course of this litigation.[17] Petitioner asserts that he has provided adequate documentation to support the expenses and argues that the Court should apply the rule in *Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930), to estimate the amounts for expenses where he is unable to provide substantiating documentation. Petitioner argues that much of the relevant substantiating documentation is unavailable to him because his assistant, Aldis, who worked on his Schedule C businesses and who he asserts prepared his 2015 Amended Return, passed away. *See supra* note 12. Petitioner asserts that Aldis maintained petitioner's records and that her estate discarded the documents after she died.

In response respondent argues that petitioner is not entitled to deduct any Schedule C–1 expenses that he reported on his 2015 Amended Return or that he asserted during the course of this litigation for the tax year at issue. Respondent contends that petitioner has failed to show that the deductions sought meet the requirements of section 162(a) and that petitioner has failed to substantiate the claimed deductions.

---

[17] Petitioner has changed the type and amount of Schedule C–1 expenses that he is seeking to deduct for his CPA business several times throughout this litigation.

**[\*21]** B.    *Legal Background*

Deductions are a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to any deduction claimed. Rule 142(a); *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). A taxpayer must show that he has met all requirements for each deduction and kept books or records that substantiate the expenses underlying it. § 6001; *Roberts v. Commissioner*, 62 T.C. 834, 836 (1974). Failure to keep and present such records counts heavily against a taxpayer's attempted proof. *See Valentine v. Commissioner*, T.C. Memo. 2022-42, at *10.

Section 162(a) allows a deduction for "ordinary and necessary expenses paid or incurred . . . in carrying on any trade or business." *See Commissioner v. Lincoln Sav. & Loan Ass'n*, 403 U.S. 345, 352 (1971). Whether an expenditure is "ordinary and necessary" is generally a question of fact. *Commissioner v. Heininger*, 320 U.S. 467, 475 (1943). To be "ordinary," the expense must be a common or frequent occurrence for the taxpayer's type of business. *Deputy v. du Pont*, 308 U.S. 488, 495 (1940). An expenditure is "necessary" if it is "appropriate and helpful" to the taxpayer's business," *Welch v. Helvering*, 290 U.S. at 113, but it must also be "directly connected with or pertaining to the taxpayer's trade or business," Treas. Reg. § 1.162-1(a). On the other hand, "personal, living, or family expenses" are not deductible. § 262(a). Section 262 takes precedence over section 162. *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 17 (1974); *Sharon v. Commissioner*, 66 T.C. 515, 522–23 (1976), *aff'd per curiam*, 591 F.2d 1273 (9th Cir. 1978). Consequently, if the origins of petitioner's claimed deductions are personal as defined under section 262, we need not consider whether they are ordinary and necessary to his Schedule C business activities. *See Kinney v. Commissioner*, T.C. Memo. 2022-81, at *10.

Under *Cohan v. Commissioner*, 39 F.2d at 543–44, if a taxpayer claims a deduction but cannot fully substantiate the underlying expense, the Court in certain circumstances may approximate the allowable amount, "bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making." The Court must have some factual basis for its estimate, however, else the allowance would amount to "unguided largesse." *Williams v. United States*, 245 F.2d 559, 560 (5th Cir. 1957).

Section 274(d) sets forth heightened substantiation requirements (and overrides the *Cohan* rule) for certain types of expenses. As in effect

**[\*22]** during 2015, section 274(d) made these strict requirements applicable for "any traveling expense (including meals and lodging while away from home)," "any item with respect to an activity which is of a type generally considered to constitute entertainment," "any expense for gifts," and "any listed property (as defined in section 280F(d)(4))." "Listed property" was defined to include "any passenger automobile." § 280F(d)(4)(A)(i); Treas. Reg. § 1.280F-6(b)(1)(i).

As in effect during 2015, section 274(d) provided that no deduction shall be allowed for the expenses set forth above "unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement" the following facts:

(A) The amount of such expense or other item;

(B) The time and place of the travel or entertainment, or the date and description of the gift;

(C) The business purpose of the expense or other item; and

(D) The business relationship to the taxpayer of persons entertained or receiving the gift.

§ 274(d) (flush language); *see* Temp. Treas. Reg. § 1.274-5T(c).

For expenses governed by section 274(d), "[w]ritten evidence has considerably more probative value than oral evidence alone," and "the probative value of written evidence is greater the closer in time it relates to the expenditure." Temp. Treas. Reg. § 1.274-5T(c)(1). Substantiation by "adequate records" generally requires the taxpayer to "maintain an account book, diary, log, statement of expense, trip sheets, or similar record," as well as evidence documenting the expenditures. *Id.* subpara. (2). To substantiate business use of vehicles an actual contemporaneous log is not strictly required, but records made at or near the time of the expenditure have greater probative value than records created subsequently. *Id.* subparas. (1) and (2).

C.    *Car and Truck Expenses*

Respondent conceded $751 of deductions for car and truck expenses that petitioner has claimed related to his Schedule C–1 CPA business. The remainder of petitioner's car and truck expenses remain in dispute.

[*23] The amount of car and truck expenses related to the CPA business that petitioner reported has evolved over time. On his 2015 Amended Return, petitioner reported $19,329 in car and truck expenses. This was based on his assertion that he drove 33,615 miles for the 2015 tax year for his Schedule C–1 CPA business. However, in his October 28, 2019 submission to respondent to substantiate his expenses, petitioner reduced the mileage that he asserted driving for his Schedule C–1 CPA business to 1,306 miles. Respondent allowed petitioner a deduction for 1,306 miles at the standard mileage rate of $0.575 for the 2015 tax year, *see* I.R.S. Notice 2014-79, § 3, 2014-53 I.R.B. 1001, 1001 ($0.575 per mile for 2015), resulting in an allowed deduction for $751.

During the trial petitioner again changed the mileage amount, this time asserting that he drove 5,200 miles for his Schedule C–1 CPA business. To substantiate this figure, petitioner submitted a 2015 calendar listing the asserted names of persons he met with and the duration of appointments he had each day of the year and a separate mileage log listing the asserted date, name, and address of each person visited and the mileage that he travelled for each meeting. The 2015 calendar was admitted into evidence as Exhibit 4-P, and the mileage log was admitted into evidence as Exhibit 504-P. Petitioner testified that he kept a calendar of his meetings and subsequently reviewed the calendar to determine the mileage and create the mileage log. The record is unclear when petitioner revisited the calendar and created the mileage log. Petitioner also testified that the individuals named in both exhibits were clients of his Schedule C–1 CPA business and that he travelled to each client for meetings.

As discussed above, section 274(d) imposes a heightened substantiation requirement and overrides the *Cohan* rule for certain expenses including travelling expenses for passenger automobiles. *See* § 280F(d)(4)(A)(i). The expense must be substantiated by adequate records or sufficient evidence that corroborates the taxpayer's statement regarding the amount, time and place, and business purpose of the expense. *See* § 274(d); Temp. Treas. Reg. § 1.274-5T(b)(6).

The 2015 calendar contains the names of individuals and entities that are clients of petitioner's Schedule C–1 CPA business and that he asserts he met with on the dates that their names appear on the calendar. Subsequently, petitioner created the mileage log where he added the address and the mileage from the Irvine Property to the address or meeting location of each individual or entity. Petitioner's testimony suggested that neither document was a contemporaneous

**[\*24]** record.[18] While contemporaneousness is not a strict requirement under section 274(d), substantiation documents created long after the expenditure have much less probative value. Temp. Treas. Reg. § 1.274-5T(c)(1) and (2). This is even more so here because the 2015 calendar and the mileage log were based on petitioner's recollection and are not corroborated by other evidence documenting the expenditures. In short, we conclude that petitioner's testimony and noncontemporaneous documentation are insufficient to satisfy the heightened substantiation requirements of section 274(d). Accordingly, with the exception of the $751 deduction that respondent previously conceded, respondent's disallowance of a deduction for petitioner's car and truck expense is sustained.

### D.     *Virtual Office Expenses*

As discussed above, petitioner asserted $1,140 in virtual office expenses related to his Schedule C–1 business activity for the 2015 tax year. Petitioner's only support for the virtual office expense was a credit card authorization form for Premier Business Centers dated November 3, 2016, for $95 per month and an invoice from Premier Business Centers dated December 1, 2013, for $95. Both documents were admitted into evidence as Exhibit 508-P. Petitioner testified that he paid $95 per month for the virtual office service but the 2013 invoice and the 2016 credit card authorization forms were the only documentation that he could find regarding the expense. The record does not contain any corroborating documentary evidence that petitioner paid any virtual office expense during the 2015 tax year.

Petitioner has generally alleged that he is unable to provide documentation for certain of the expenses and urges the Court to approximate them under the *Cohan* rule. We decline to do so because

---

[18] THE WITNESS: Okay. Usually what I do when I want to substantiate, I tell all my clients to keep a calendar because I've talked to IRS agents and they don't even keep contemporaneous mileage. But if you have a calendar and you say where you're going, and you know where it is, then you can go recreate it and it is kind of contemporaneous on the calendar. So I have a calendar in there and it shows where I went and who I saw. And I went down and I just used—I put the address of where I went and I used the—the Google Maps to determine the mileage.

Tr. 131:2–12.

**[\*25]** petitioner has not demonstrated that any virtual office expense was paid in the 2015 tax year.

The substantiation documentation that petitioner provided to respondent and which was admitted into evidence as Exhibit 4-P includes some of petitioner's credit card and bank statements from the 2015 tax year for his Chase Bank and Discover credit cards. These credit card statements from 2015 do not include any charges for Premier Business Centers or for $95 that could potentially be associated with the virtual office expense.

Exhibit 4-P also includes portions of petitioner's Bank of America checking account statements from 2015 that include check images for checks petitioner drafted for his CPA business. Petitioner submitted these statements to respondent and this Court as support for other expenses that he is claiming. The inclusion of these statements for other purposes indicates to the Court that petitioner could have obtained credit card statements, bank account statements, or copies of checks reflecting that he paid a monthly virtual office expense to Premier Business Centers for $95 during the 2015 tax year. Petitioner has not provided any substantiation or factual basis that such an expense was paid in the 2015 tax year, and we decline to approximate any amount under the *Cohan* rule.

### E.   *Expenses Related to the Irvine Property*

The amount of expenses related to the Irvine Property that petitioner has asserted as Schedule C–1 CPA business expenses has changed several times during this litigation.[19] For purposes of the

---

[19] *See* Pet'r's Proposed Statement of Facts, Exhibit C (asserting $21,542 in business expenses related to the Cerrito Property). We note that petitioner's Proposed Statement of Facts contradicts his Pretrial Memorandum on which business the expenses related to: his CPA business or his CAAJ Leasing Trust business. In petitioner's Proposed Statement of Facts, he stated that the Cerrito Property was used, in part, for his Schedule C–2 business, CAAJ Leasing Trust, but he stored some CPA files related to his Schedule C–1 CPA business at the Cerrito Property. He further stated that he allocated the $21,542 of expenses for the Cerrito Property as follows: "Amount to CAAJ schedule C is $21,542 less $2,400 (CPA storage) to CPA schedule C or $19,142." However, in his Pretrial Memorandum petitioner asserted $20,505 of expenses related to the Cerrito Property to calculate the adjusted net income of the CPA business. Pet'r's Pretrial Memo. 7. As discussed *infra*, the nature and extent of petitioner's alleged CAAJ Leasing Trust business is unclear. Accordingly, we will consider the $20,505 of expenses related to the Cerrito Property that petitioner asserted in his pretrial memorandum in connection with his CPA business.

[*26] analysis below, we will use petitioner's most recent asserted expense amount of $20,505, which he asserted in his Pretrial Memorandum. This amount comprised $11,754 in mortgage interest, $4,620 in homeowners' association costs, $3,651 in property taxes, and $480 in utilities, all related to the Irvine Property. We note that these expenses were not reported on petitioner's 2015 Amended Return or his October 28, 2019 submission to respondent to substantiate expenses associated with his Schedule C–1 CPA business activity.

1.    *Mortgage Interest*

We begin with the asserted mortgage interest expense for the Irvine Property, which was the largest of the expenses that petitioner asserts were related to his Schedule C–1 CPA business. As discussed above, only ordinary and necessary expenses paid or incurred in carrying on a trade or business are deductible under section 162(a). Additionally, under section 262(a), "personal, living, or family expenses" are not deductible. Petitioner has not provided evidence sufficient to indicate that the mortgage interest expense asserted in his Pretrial Memorandum as a Schedule C–1 CPA business expense was an ordinary and necessary expense directly related to his Schedule C–1 CPA business.

Petitioner and Mercure testified that petitioner took out two loans from Mercure for $75,000 and $150,000 that were secured by the Irvine Property and the Running Springs Property. However, petitioner testified that Mercure paid the $75,000 directly to Singer at Adobe to repay the loan on his primary residence. Additionally, Mercure testified that petitioner made monthly interest payments of $11,754 on the loans and that she reported the interest as income on her 2015 return.

There was conflicting testimony as to whether the Irvine Property was used primarily for petitioner's Schedule C–1 CPA business. Singer and Mercure testified that petitioner had an office at the Irvine Property; however, Mercure also testified that she understood it to be a second home. Additionally, petitioner testified that he did not meet clients at the Irvine Property and instead drove to the client's location. Regardless of the primary use of the Irvine Property, petitioner has not provided evidence sufficient to substantiate any purported interest payments. Aside from petitioner's and Mercure's testimony, there is no corroborating documentary evidence in the record (canceled checks, bank statements, receipts, etc.) that show petitioner paid mortgage interest, that the interest was an ordinary and necessary business

[*27] expense of his Schedule C–1 CPA business, and that the interest was paid in 2015. Accordingly, petitioner's asserted Schedule C–1 mortgage interest deduction is disallowed.

2.  *Homeowners' Association Costs, Property Taxes, and Utilities*

In addition to mortgage interest, in his Pretrial Memorandum petitioner asserted Schedule C–1 expenses for homeowners' association costs, property taxes, and utilities. However, the only evidence that petitioner offered that he paid any of these expenses for the Irvine Property during the 2015 tax year was his testimony. Petitioner's self-serving testimony in this case is an insufficient basis on which to allow a Schedule C deduction or to apply the *Cohan* rule. *See Green Gas Del. Statutory Tr. v. Commissioner*, 147 T.C. 1, 65 (2016) (declining to apply the *Cohan* rule where only corroboration for documentary evidence was taxpayer's self-serving testimony), *aff'd,* 903 F.3d 138 (D.C. Cir. 2018).

First, there is no evidence that petitioner paid any homeowners' association costs for the Irvine Property in 2015. Petitioner testified that he did not have any supporting documentation for the expense but stated that it was $385 a month so he multiplied it by 12 months to reach the total amount that he reported. He provided no corroborating canceled checks, bank statements, or receipts to indicate that he actually made the payments. Moreover, on cross-examination petitioner waivered when asked whether it was true that he did *not* pay his homeowners' association costs in 2015, stating: "It—probably. I don't know." Petitioner's testimony, standing alone, does not support his claim for a Schedule C deduction for homeowners' association costs.

There are similar problems with petitioner's asserted Schedule C–1 expenses for property taxes and utilities. Petitioner testified that he paid the property taxes and utility expenses for the Irvine Property in 2015; however, he failed to provide sufficient corroborating documentation for those expenses. The Court admitted into evidence the property tax bill for the Irvine Property; however, the bill does not indicate that petitioner made a payment for the 2015 property taxes on the Irvine Property. Again, on cross-examination petitioner waivered on whether he paid the Irvine Property taxes in 2015. When asked whether it was true that he did *not* pay the property taxes in 2015 he stated: "I don't know, probably—maybe not."

[*28] The Court admitted into evidence an account printout for online billing and payments for electricity provider Southern California Edison from May 2020 to March 2022. Notably, the account printout does not state the property address for which the electricity service was provided. Petitioner added the handwritten address for the Irvine Property to the statement. We also note that the account printout clearly has links for each monthly bill that allows the user to access a copy of the monthly bill. Presumably, the monthly bill from Southern California Edison would have the property address where it provided electricity service, as well as the specific electricity usage details and charges.

Petitioner did not provide any individual monthly bill demonstrating that the account was for the Irvine Property. He testified that utility bills were unavailable for the 2015 year and that 2020 was as far back as he could obtain any. He further testified that the account printout that he submitted demonstrated that the utility bill averaged $40 a month and that the amount has been about the same over the years, and as a result, he estimated the yearly cost at $480.

While the account printout indicates that petitioner paid utility expenses from May 2020 to March 2022, the statement does not have a service address linking the account to the Irvine Property. Additionally, the printout does not address petitioner's electric service or payments for the 2015 tax year. In short, the information on the account printout (and importantly the omission of evidence linking the statement to electric service provided at the Irvine Property) does not support petitioner's asserted Schedule C–1 utility expense deduction at the Irvine Property for the 2015 tax year.

In sum, petitioner is not entitled to deduct Schedule C–1 expenses for homeowners' association costs, property taxes, and utilities that were associated with the Irvine Property because he has failed to substantiate those expenses.

F.    *Continuing Education*

Petitioner asserted a Schedule C–1 deduction for a continuing education expense of $599 related to his CPA business. At trial petitioner testified that he paid the continuing education expense but had no documentation to support it. He testified that he estimated the expense was $600. He did not testify that he paid the expense in the 2015 tax year. In this case, petitioner's self-serving testimony alone is insufficient to substantiate his entitlement to a Schedule C–1 deduction

**[\*29]** for a continuing education expense. *See Green Gas Del. Statutory Tr.*, 147 T.C. at 65.

> G.    *Health Insurance*

The final Schedule C–1 expense at issue is petitioner's assertion of a health insurance adjustment to income of $4,294. Respondent has conceded an adjustment to income for a self-employed insurance deduction of $1,259 for Medicare Part B premiums for tax year 2015. The rest remains in dispute.

Petitioner testified that he paid premiums to Blue Cross, of $3,035 for the 2015 tax year. However, petitioner did not provide any corroborating documents or other evidence showing that he made payments to Blue Cross in 2015. The only support petitioner provided for the payment of the health insurance premiums was his testimony that "Blue Cross was at the time—I can't believe how much it went up—was only $759 a quarter, so I paid 3,035." When asked if he had other documentation to support the payments to Blue Cross, petitioner stated: "No. I don't have—I didn't have any receipts or anything." Except for the Medicare Part B premiums that respondent conceded, petitioner is not entitled to a health insurance adjustment to income because he has not substantiated that he made health insurance payments to Blue Cross in tax year 2015.

IV.    *CAAJ Leasing Trust*

On Schedule C–2 of his 2015 Amended Return, petitioner reported $1,250 of income, $72,500 of expenses, and a net loss of $71,250. At trial petitioner changed the amount of Schedule C–2 expenses that he was asserting to $80,000. Respondent argues that petitioner is not entitled to the Schedule C–2 expense deductions because he has failed to show that the deductions sought meet the requirements of section 162(a) and because petitioner failed to substantiate the claimed deductions.

The nature of CAAJ Leasing Trust, petitioner's Schedule C–2 business, is unclear. At trial petitioner provided uncertain and contradictory testimony on what assets were leased by the Schedule C–2 business. First, he testified that the business leased his 1987 Jeep as a day lease. Then he testified that the Jeep was used only in his CPA business and that he did not lease it to others. Next, he testified that he thought that CAAJ Leasing Trust leased a backhoe to a construction company. On the Schedule C–2 attached to his 2015 Amended Return,

**[\*30]** petitioner reported "Other Expenses" for a "Court Judgment Related to Equipment" for $72,500. Petitioner also claimed a deduction for the same "Court Judgment Related to Equipment" on his Schedule C–2 for his 2016 tax return.

As discussed, petitioner's 1987 Jeep was towed by his homeowners' association from outside the Irvine Property in 2009. Petitioner sued the various parties involved, including the tow company and the homeowners' association. In turn these parties sued petitioner for malicious prosecution and on April 6, 2015, secured a judgment against him for $73,767. Petitioner did not pay the judgment and actively contested the lawsuit until June 9, 2017, when the Court of Appeal of California reversed the judgment in *Aulisio,* 2017 WL 2493139.

Accordingly, the judgment against petitioner was overturned by the time he signed his 2015 Amended Return on October 23, 2017. At trial when asked why he included the $72,500 deduction on the Schedule C–2 of his 2015 Amended Return after the judgment had been overturned, petitioner stated that he did so "because the appeal process wasn't over for the appellee."

Petitioner has made varying arguments explaining why he claimed the $72,500 deduction on the Schedule C–2 of his 2015 Amended Return after the judgment had been overturned by the Court of Appeal of California. Additionally, petitioner sought to change his method of accounting to the accrual method for the Schedule C–2 business on his 2015 Amended Return.

Under section 461, in general, an accrual basis taxpayer may deduct an expense only "in the taxable year in which all events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability." Treas. Reg. § 1.461-1(a)(2). However, where a liability is contingent on the outcome of a contested lawsuit, it is apparent that neither the fact nor the amount of the expense would be reasonably ascertained, and consequently the expense would not be deductible. *See Dixie Pine Prods. Co. v. Commissioner*, 320 U.S. 516, 519 (1944); *Lucas v. Am. Code Co.*, 280 U.S. 445, 452 (1930). Section 461(f) provides an exception to this rule for an accrual method taxpayer if the payment is actually made.

**[\*31]** Petitioner gave conflicting testimony on whether the 1987 Jeep was used or leased in his CAAJ Leasing Trust business. In light of his conflicting statements we do not find petitioner's testimony on this point credible. There is no evidence to suggest that the judgment secured against petitioner for malicious prosecution related to the towing of the 1987 Jeep was an ordinary and necessary expense paid in carrying on petitioner's CAAJ Leasing Trust business.

More importantly, even if we assume that (1) the expense was related to petitioner's CAAJ Leasing Trust business and (2) the CAAJ Leasing Trust business was on the accrual method of accounting, petitioner was not entitled to deduct the expense as an accrual basis taxpayer because he actively contested the liability in 2015. *See Dixie Pine Prods. Co.*, 320 U.S. at 519; *Lucas v. Am. Code Co.*, 280 U.S. at 452. Moreover, petitioner would not be entitled to deduct the expense under the cash method of accounting because he never paid the liability. In summary, petitioner had no basis to claim the judgment for malicious prosecution as a deduction on his 2015 Amended Return. He is not entitled to deduct the $72,500 of Schedule C–2 expenses that he reported on his 2015 Amended Return or the $80,000 of Schedule C–2 expenses that he asserted at trial.

## V.   *NOL*

The asserted origins and amount of petitioner's claimed NOL deduction have evolved in his tax returns and the information that he provided to respondent and this Court. Petitioner did not claim any NOL deduction on his 2015 Return. Then, on his 2015 Amended Return petitioner deducted an NOL of $437,141.

Petitioner first argues that the burden of proof on this issue should shift to respondent because he has introduced credible evidence regarding any factual issues that are relevant to establishing tax liability. Petitioner asserts that this is so because he made a Freedom of Information Act (FOIA) request to the government for information relating to a 1998 audit that he believed was relevant to the NOL, and the IRS refused to give that information to petitioner. As we understand his argument, because he made a FOIA request that was denied or from which he did not receive the information sought, he has introduced credible evidence regarding the factual underpinnings of the NOL and, therefore, the burden should shift to respondent. As to the merits of the origin and existence of the NOL, petitioner asserted that the lessee of the equipment filed for bankruptcy and that a bankruptcy court seized

**[\*32]** the leased equipment belonging to petitioner to satisfy the lessee's debts. Respondent argues that petitioner failed to provide sufficient documentation to substantiate the initial loss and how the NOL was used and calculated in the intervening years. Respondent also argues that petitioner failed to establish either when the underlying losses were incurred or that the *Cohan* rule applies here.

As discussed *supra*, petitioner has introduced his entitlement to an NOL deduction into this case through the 2015 Amended Return and his pleadings before this Court. Because he raised the NOL as a new matter, the burden of proof remains with petitioner. Additionally, the burden of proof on this issue does not shift to respondent under section 7491(a) because, as discussed *infra*, petitioner has failed to present credible evidence with respect to the NOL deduction and has instead provided contradictory testimony and exhibits as to the origin and nature of the alleged loss. Accordingly, the burden of proof remains on petitioner with respect to the NOL deduction.

Section 172 allows a taxpayer to deduct an NOL for a taxable year. The amount of the NOL deduction equals the aggregate of the NOL carryovers and NOL carrybacks to the taxable year. § 172(a). Section 172(c) defines an NOL as the excess of deductions over gross income, computed with certain modifications specified in section 172(d). *See, e.g.*, *Amos v. Commissioner*, T.C. Memo. 2022-109, at \*6 (citing *Jasperson v. Commissioner*, T.C. Memo. 2015-186, at \*6, *aff'd per curiam*, 658 F. App'x 962 (11th Cir. 2016)).

An unused NOL is first required to "be carried to the earliest of the taxable years to which . . . such loss may be carried." § 172(b)(2); *McRae v. Commissioner*, T.C. Memo. 2019-163, at \*23. Any excess NOL that is not applied in one year is carried to the then-ensuing year. § 172(b)(2). Absent an election under section 172(b)(3), an NOL for any taxable year first must be carried back 2 years and then carried over 20 years. § 172(b)(1)(A), (2), (3). A taxpayer claiming an NOL must file with his return "a concise statement setting forth the amount of the net operating loss deduction claimed and all material and pertinent facts relative thereto, including a detailed schedule showing the computation of the net operating loss deduction." Treas. Reg. § 1.172-1(c).

"A taxpayer who claims a net operating loss deduction bears the burden of establishing both the existence of the net operating loss and the amount that may be carried over to the year involved." *Chico v. Commissioner*, T.C. Memo. 2019-123, at \*39 (citing *Keith v.*

**[\*33]** *Commissioner*, 115 T.C. 605, 621 (2000)), *aff'd without published opinion*, No. 20-71017, 2021 WL 4705484 (9th Cir. Oct. 8, 2021). "A taxpayer 'cannot rely solely on [her] own income tax returns to establish the losses [she] sustained.'" *Amos*, T.C. Memo. 2022-109, at \*7 (quoting *Barker v. Commissioner*, T.C. Memo. 2018-67, at \*13, *aff'd*, 853 F. App'x 571 (11th Cir. 2021)); *see also Wilkinson v. Commissioner*, 71 T.C. 633, 639 (1979). The taxpayer "must establish that the NOL was not fully absorbed in the years preceding the particular year for which he seeks the NOL deduction." *Villanueva v. Commissioner*, T.C. Memo. 2022-27, at \*3. Thus, to meet his burden petitioner must introduce persuasive evidence regarding the year in which he incurred the NOL and also prove his taxable income for the period beginning the year immediately following the creation of the NOL and ending with 2015.[20] *See Power v. Commissioner*, T.C. Memo. 2016-157, at \*14.

Petitioner is not entitled to deduct the claimed NOL carryforward deductions for 2015 because (1) he failed to provide sufficient evidence of the underlying NOL, including when it originated, and (2) he failed to show that any NOL was available to carry forward to the year at issue. We address each point below.

Petitioner has failed to establish the facts underlying the NOL and when it originated. Petitioner testified that the NOL originated from certain equipment that was leased by his Schedule C–2 business to companies in North and South Carolina. Petitioner testified that the equipment lessees filed for bankruptcy and that the bankruptcy court gave his leased property to the lessees' creditors. The record contains no documentation regarding the bankruptcy proceedings. We also note that petitioner already claimed losses for the bankruptcies on his tax returns for each of 2013 and 2014. On his Schedules C–2 for 2013 and 2014 he claimed deductions for Other Expenses for a "bankruptcy in NC" of $145,570 and $145,600, respectively. Petitioner did not explain or provide any evidence differentiating these losses claimed on his 2013 and 2014 Schedules C–2 from the NOL currently at issue.

Additionally, the date on which the losses arose is unclear. Petitioner provided respondent with a schedule, Net Operating Loss Worksheet 3, that was attached to his 2014 tax return and which alleged

---

[20] Additionally, absent an election to forgo the carryback of an NOL, a taxpayer must prove his taxable income for the two years before the creation of the loss. *See Flora v. Commissioner*, T.C. Memo. 1965-64, 24 T.C.M (CCH) 333, 339 (citing *Pennock v. Commissioner*, 25 B.T.A. 1331 (1932), *aff'd*, 64 F.2d 1018 (2d Cir. 1933)).

**[\*34]** that the NOL originated in 2001. However, petitioner's 2001 IRS account transcript indicates that petitioner did not file a tax return in 2001. On his 2015 Amended Return petitioner reported that the NOL was from 2013. In an October 2019 meeting with respondent's tax compliance officer, petitioner stated that the NOL was incurred in 2008 or 2009.

In addition, petitioner did not provide respondent or the Court with documentation to substantiate the losses. At trial petitioner testified that "he does not have documentation for the deduction at the time the NOL originated." The only documents petitioner provided to establish the NOL were the first page of a Form 1040 from 2014, an NOL worksheet from a 2014 tax return, and the first page of a Federal Statement from the 2015 Return. He introduced no other evidence or documents regarding (1) how the NOL was computed or (2) bills, receipts, books, checks, or records of the entity that incurred the NOL.

Petitioner also gave inconsistent reasons to respondent's tax compliance officer and this Court as to why he did not provide documents to substantiate the NOL. Initially, he told the tax compliance officer that he could not provide the documents because they were on his computer and something happened to his computer. However, at trial he testified that Aldis maintained all of the records relating to the NOL and they were lost when she passed away. Regardless of these inconsistencies, petitioner did not present respondent or this Court with adequate documentation substantiating the origin, nature, and calculation of the NOL.

Absent some other corroborating documents, tax returns (or portions thereof) that simply restate a taxpayer's claim coupled with a taxpayer's testimony are not sufficient to substantiate a taxpayer's entitlement to a loss carryforward. *See Amos*, T.C. Memo. 2022-109, at \*7; *Bulakites v. Commissioner*, T.C. Memo. 2017-79, at \*8; *see also Rosser v. Commissioner*, T.C. Memo. 2001-79, 81 T.C.M. (CCH) 1467, 1471 (finding tax returns did not establish that the taxpayer had income and losses in the amounts reported on the returns); *McWilliams v. Commissioner*, T.C. Memo. 1995-454, 70 T.C.M. (CCH) 783, 789 (denying deductions for NOLs where taxpayers failed to submit any evidence of the NOLs other than the tax returns on which the NOLs allegedly originated).

Petitioner also failed to show that any NOL was available to carry forward to the year at issue. Specifically, petitioner failed to introduce

**[\*35]** into the record evidence that would give a complete picture of his gross income and expenses as necessary to substantiate the claimed NOL. As discussed above, the record contains some documents, including a Net Operating Loss Worksheet 3, that were attached to petitioner's 2014 tax return, his 2013 through 2018 tax returns, and his IRS account transcripts from 2001 through 2012 that support his assertion that he has claimed and carried forward an NOL. However, these documents do not establish the date, amount, calculation, and use of the NOL from its origin through the intervening years to 2015. Thus, the record in this case is inadequate to substantiate petitioner's entitlement to an NOL carryforward. Petitioner is not entitled to the NOL carryforward deduction of $437,141 that he claimed on his 2015 Amended Return, and we will sustain the Commissioner's disallowance of this deduction.[21]

## VI.   *Itemized Deductions*

### A.   *Home Mortgage Interest*

Finally, there are several Schedule A itemized deductions that remain at issue. First, petitioner asserted his entitlement to an itemized deduction for home mortgage interest for the Laguna Beach Property for $42,500. Petitioner did not claim this deduction on any 2015 return, instead raising it for the first time during this litigation.

Petitioner purchased the Laguna Beach Property through the CAAJ Leasing Trust, and Donatelli signed the loan as the trustee of the CAAJ Leasing Trust.[22] Singer did not request that Donatelli sign on the loan for the Laguna Beach Property. Singer testified that petitioner wanted the loan be in the name of the CAAJ Leasing Trust and because Singer needed a signatory for the trust, Donatelli signed the loan as the

---

[21] Petitioner argued at trial and on brief that the Court can approximate his allowable NOL carryforward deduction under *Cohan*. The *Cohan* rule is inappropriate here because petitioner has failed to adduce evidence substantiating the origin, nature, and calculation of the NOL. *See Deutsch v. Commissioner*, T.C. Memo. 2012-318, at *19 n.20.

[22] On cross-examination, Donatelli stated that she had "no duties with the CAAJ Trust." Donatelli testified that she was only a "nominee" trustee of the CAAJ Leasing Trust. Petitioner did not provide testimony or other evidence as to why Donatelli served as a "nominee" trustee for CAAJ Leasing Trust. We note that in petitioner's opening statement to the Court he stated that Donatelli would testify that she was acting as the nominee trustee for the CAAJ Leasing Trust so that he was able to get a loan on his primary home, the Laguna Beach Property.

**[\*36]** trustee of the CAAJ Leasing Trust. Thus, the Form 1098 issued by Adobe was issued to Donatelli as the trustee of the CAAJ Leasing Trust. However, the payer's Social Security number listed on the Form 1098 did not match Donatelli's Social Security number. Singer testified that at petitioner's request, he changed the Social Security number on the Form 1098s, but he could not recall in what year that change occurred. Singer also testified that Adobe submitted the Form 1098 with the information petitioner provided.

Petitioner provided respondent with substantiation for four mortgage payments that he made to Adobe in 2015 totaling $14,164. Respondent has conceded a deduction in this amount.[23] Petitioner acknowledged that he was unable to substantiate the remaining eight mortgage payments.

As with other expenses discussed above, petitioner failed to provide documents or evidence substantiating that he made the remaining eight mortgage payments in 2015. Without bank records, bank statements, canceled checks, receipts, or other records, petitioner is unable to substantiate that he made the remaining eight mortgage payments to Adobe. Because petitioner has failed to substantiate the $28,336 of mortgage interest payments, he is not entitled to a Schedule A mortgage interest deduction in excess of the $14,164 that respondent previously conceded.

B.    *Real Property Taxes*

During this litigation petitioner asserted that he was entitled to a deduction for property taxes paid for the Running Springs Property and the Laguna Beach Property. He provided no documentation to substantiate that he paid the property taxes for the Laguna Beach

---

[23] We note that even though the obligor on the mortgage payments was the CAAJ Leasing Trust, petitioner is nonetheless entitled to deductions for mortgage interest indebtedness on a mortgage on real estate of which he is the legal or equitable owner under Treasury Regulation § 1.163-1(b) provided that he can substantiate the expense. *See* Treas. Reg. § 1.163-1(b) ("Interest paid by the taxpayer on a mortgage upon real estate of which he is the legal or equitable owner, even though the taxpayer is not directly liable upon the bond or note secured by such mortgage, may be deducted as interest on his indebtedness."); *see also Abarca v. Commissioner*, T.C. Memo. 2012-245, at \*12–15 (explaining that Treasury Regulation § 1.163-1(b) provides an exception to the general rule that interest paid on an obligation of the taxpayer is deductible only by that taxpayer, and not an obligation of another).

[*37] Property during 2015.[24] Instead, petitioner provided the property tax bill for the Laguna Beach Property but did not introduce any documentation or receipts indicating that he had paid it in 2015.

Conversely, Exhibit 514-P attaches a confirmation receipt from the San Bernardino County Tax Collector which shows that on December 10, 2015, property taxes of $1,084 were paid by credit card to San Bernardino County. This amount closely corresponds to the Running Springs Property real property tax bill, which is also attached to Exhibit 514-P.[25] The payment receipt does not state the address of the parcel subject to the property taxes; however, the payment receipt contains the following description line item identifier: "TAX PMT APN 0328233120000." That description line item identifier matches the numerical identifier that was listed on the real property tax bill for the Running Springs Property, which does list the address of the Running Springs Property.

We note that the real property tax bill for the Running Springs Property lists the CAAJ Leasing Trust as the owner of record; however, the confirmation receipt states that the payor's billing address was the Laguna Beach Property and lists an email address belonging to petitioner. Thus, while the owner of record for the Running Springs Property was the CAAJ Leasing Trust, it appears that petitioner paid $1,084 in property taxes by credit card on December 10, 2015, on behalf of the CAAJ Leasing Trust. Finally, while the payment receipt does not state the address of the Running Springs Property as the parcel subject to property tax, the matching numerical identifiers on the property tax bill and the payment receipt demonstrates to the Court that the $1,084 in property taxes was paid with respect to property taxes for the Running Springs Property.

Section 164 allows a deduction for certain taxes, including state and local real property taxes, regardless of whether they were paid or incurred in a trade or business. *Tschetter v. Commissioner*, T.C. Memo. 2003-326, 86 T.C.M. (CCH) 639, 645. Generally, taxes are deductible

---

[24] Exhibit 514-P attached a confirmation receipt for real property taxes of $5,284 paid to Orange County on November 22, 2021, for the Laguna Beach Property. The receipt clearly states that the payment was for the 2021 tax year real property taxes.

[25] The Running Springs Property real property tax bill for July 1, 2014, through June 30, 2015, indicates that the full year bill totaled $2,068.64 and the half year bill totaled $1,043.

**[*38]** only by the person upon whom they are imposed. *See Tuer v. Commissioner*, T.C. Memo. 1983-441, 46 T.C.M. (CCH) 870, 871; Treas. Reg. § 1.164-1(a). However, we have held that taxpayers who do not hold legal title to property but who establish they are equitable owners of the property are entitled to deduct property tax they paid for the property. *See Steinert v. Commissioner*, 33 T.C. 447, 449 (1959) (first citing *Horsford v. Commissioner*, 2 T.C. 826 (1943); and then citing *Estate of Movius v. Commissioner*, 22 T.C. 391 (1954)); *Trans v. Commissioner*, T.C. Memo. 1999-233, 78 T.C.M. (CCH) 96, 101. Moreover, "[u]nder general principles of trust law, trust beneficiaries hold 'the equitable estate or beneficial interest in' property held in trust and are 'regarded as the real owner[s] of [that] property.'" *Steinhart v. Cnty. of L.A.*, 223 P.3d 57, 72 (Cal. 2010) (quoting *Title Ins. & Tr. Co. v. Duffill*, 218 P. 14, 20 (Cal. 1923)).

Petitioner formed the CAAJ Leasing Trust to lease equipment in the hope that he "could live off of the rent of the equipment and just kind of retire." He placed assets in the CAAJ Leasing Trust, including the Running Springs Property, which was his secondary home. The record in this case indicates that petitioner was the beneficiary of the CAAJ Leasing Trust as he formed the trust with the purpose of retiring on its income. Petitioner as the trust beneficiary and the equitable owner of the property held by the CAAJ Leasing Trust paid the real property taxes of $1,084 for the Running Springs Property.[26] Accordingly, petitioner is entitled to deduct $1,084 in real property taxes that he substantiated for the Running Springs Property. Petitioner is not entitled to deduct any other real property taxes for either the Running Springs Property or the Laguna Beach Property because he failed to substantiate that he paid those expenses.

C.    *Charitable Contributions*

Petitioner did not claim a charitable contribution deduction on any 2015 return. He asserted the deduction, for the first time, in his Pretrial Memorandum. Petitioner asserts a deduction for $500 for a gift to the Friends of the LA Philharmonic. To substantiate this deduction, petitioner introduced into evidence an undated letter from the "Friends of the LA Phil" that states: "Thank you for your gift! Your membership

---

[26] Respondent did not contest petitioner's ownership of the Running Springs Property for purposes of challenging any of the expenses that petitioner asserted with respect to the Running Springs Property.

[*39] has been upgraded. You are now at the Rhapsody ($500) membership level."

Generally, section 170(a) allows a deduction for any "charitable contribution" made by the taxpayer. A contribution of $250 or more must satisfy the requirement of section 170(f)(8)(A), which provides that the taxpayer must substantiate the contribution with a contemporaneous written acknowledgment from the donee organization.[27] Treas. Reg. § 1.170A-13(f)(1). As relevant here, the acknowledgment must include the amount of cash and a description of any property other than cash contributed. § 170(f)(8)(B)(i); Treas. Reg. § 1.170A-13(f)(2)(i). It must also include a statement regarding whether the donee organization provided any goods or services in consideration for the contribution and a description and good faith estimate of the value of any such services. § 170(f)(8)(B)(ii) and (iii); Treas. Reg. § 1.170A-13(f)(2)(ii) and (iii).

The undated letter that petitioner submitted to substantiate the asserted deduction does not satisfy the requirements of section 170(f)(8) and Treasury Regulation § 1.170A-13(f). Even if we assume petitioner made a contribution to the LA Philharmonic in 2015, the letter does not state the amount that petitioner contributed or whether it was a cash contribution or a contribution of property other than money. The letter also does not state whether the donee organization provided any goods or services in consideration for any property transferred to the donee, and fails to provide a description and good faith estimate of the value of any such goods and services that were provided. Therefore, petitioner is not entitled to a $500 charitable contribution deduction under section 170(a).

VII.  *Conclusion*

For the reasons discussed above, we hold that for tax year 2015 petitioner (1) had $22,492 of unreported income and $123,180 of Schedule C–1 gross receipts as reported on his 2015 Amended Return;

---

[27] *See Addis v. Commissioner*, 374 F.3d 881, 887 (9th Cir. 2004) (holding that taxpayer's failure to satisfy the substantiation provisions of section 170(f)(8) for payments of $250 or more resulted in a complete denial of charitable contribution deduction), *aff'g* 118 T.C. 528 (2002). Separate contributions of less than $250 are not subject to the requirements of section 170(f)(8), regardless of whether the contributions made by a taxpayer to a donee organization during a taxable year total $250 or more. Treas. Reg. § 1.170A-13(f)(1). Petitioner has made no assertion that he made multiple donations of less than $250.

**[\*40]** (2) is not entitled to deduct $42,541 of Schedule C–1 expenses associated with his CPA business; (3) is not entitled to deduct $80,000 of Schedule C–2 expenses associated with his leasing business; (4) is not entitled to deduct an NOL of $437,141; (5) is not entitled to deduct $28,336 of Schedule A home mortgage interest; (6) is entitled to deduct $1,084 of property taxes; and (7) is not entitled to deduct $500 of charitable contributions.

We have considered all other arguments made and facts presented in reaching our decision, and, to the extent not discussed above, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*